NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 08-148


JOHN D. TESTA, JR.

VERSUS

KAYS ENTERPRISES, INC.


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 59,678
HONORABLE STEPHEN BRUCE BEASLEY, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


JOHN D. SAUNDERS
JUDGE


\*\*\*\*\*\*\*\*\*\*


Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and
Elizabeth A. Pickett, Judges.


AFFIRMED.


Edward P. Chevallier, Jr.
Attorney at Law
770 San Antonio Avenue
Many, LA 71449
(318) 256-8858
Counsel for Plaintiff/Appellant:
John D. Testa, Jr.

**Randal Bryan Tannehill**
**Tannehill & Sylvester**
**2900 Military Hwy**
**Pineville, LA 71360**
**(318) 641-1550**
**Counsel for Defendant/Appellee:**
**Kays Enterprises, Inc.**

**SAUNDERS, Judge.**

This case involves a redhibition suit. The plaintiff and the defendant contracted for the defendant to construct a boat dock on the plaintiff's land in exchange for $5,000.00. After construction was completed, the plaintiff was not satisfied with the construction and brought a redhibition suit against the defendant.

The trial court found that the plaintiff failed to carry his burden of proving that the defects in the construction of the boat dock were redhibitory. The plaintiff appealed. We affirm.

**FACTS AND PROCEDURAL HISTORY:**

On August 18, 2006, the plaintiff, John D. Testa (Testa), orally contracted with the defendant, Kays Enterprises, Inc. (Kays) for the construction of a boat dock at his residence on Toledo Bend Lake in Sabine Parish for the sum of $5,000.00. The boat dock consisted of three parts: (1) a permanent deck, located at the 172 foot elevation of Toledo Bend Lake with the dimensions of four feet by four feet, (2) an "L" shaped floating dock, located on the lake that rises and falls in relation to the water level of the lake, with the dimensions of ten feet by four feet and twenty-four feet by four feet, (3) a gangplank that connects the permanent deck to the floating dock, with dimensions of twenty feet by four feet.

Both parties agree that Testa paid the $5,000.00 in full to Kays. The parties disagreed whether Kays fulfilled its duty under the contract to construct a boat dock in a workman like manner, free from redhibitory defects. Testa originally filed a clerk's docket suit on February 16, 2007, alleging Kays was indebted to him for the amount of $1,840.00. Kays filed an answer to this suit on March 7, 2007. Testa then amended his suit on May 25, 2007, alleging that Kays was now indebted to him for the amount of $2,696.74. Testa then filed a second amendment to his suit, alleging

the existence of redhibitory defects in the boat dock and petitioned the court for the return of the $5,000.00 contracted price of the boat dock's construction.

Trial was held on this matter on November 14, 2007. The trial court issued judgment on December 5, 2007, in favor of Kays, finding that Testa failed to establish a redhibitory defect in the boat dock and dismissed his suit. It is from this judgment that Testa has appealed, alleging three assignments of error.

**ASSIGNMENTS OF ERROR:**

1.  Did the trial court err when it failed to find that the finished product, designed and produced by Kays, and presented to Testa was not redhibitory in numerous aspects entitling Testa to a rescission of the sale and a return of the complete purchase price of $5,000.00?

2.  In the alternative to assignment of error #1, did the trial court err when it failed to find that the finished product designed and produced by Kays, and presented to Testa, was not redhibitory, entitling Testa to an award in damages sufficient to repair the defective work, as an alternative remedy in this matter?

3.  Did the trial court err when it failed to award reasonable expert fees, attorney's fees, and nonpecuniary damages in this matter?

**ASSIGNMENTS OF ERROR #1 AND #2:**

In his first assignment of error, Testa argues that the trial court erred when it failed to find that the finished product, as designed and produced by Kays, and presented to Testa, was not redhibitory in numerous aspects entitling Testa to a rescission of the sale and a return of the complete purchase price of $5,000.00. In his second assignment of error, Testa's argument is essentially the same as in assignment of error #1, i.e., the finished product was redhibitory. However, in assignment of error #2, Testa asks for an alternative remedy, an award in damages sufficient to repair the defective work. For the following reasons, we find these assignments of error lack merit.

Louisiana Civil Code Article 2520 states:

2

The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.

A defect is redhibitory when it renders the thing useless, or its use is so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.

A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.

"Multiple defects can collectively form the basis of a redhibitory action even though many of the defects are minor or have been repaired." *Young v. Ford Motor Co., Inc.*, 595 So.2d 1123, 1126 (La.1992). Whether a product sold to another is redhibitory is a question of fact and subject to the well-established manifest error standard of review. *Dickerson v. Begnaud Motors, Inc.*, 446 So.2d 536 (La.App. 3 Cir. 1984), *writ denied*, 449 So.2d 1349 (La.1984).

The record has conflicting testimony regarding the usefulness of the boat dock. Our supreme court in *Rosell v.ESCO*, 549 So.2d 840, 844-45 (La.1989) (citations omitted), stated the following:

When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

Thus, in order for Testa to prevail in either of these two assignments of error, he must first show that, based on the evidence in the record, the finder of fact was

unreasonable in its determination that he failed to prove that the boat dock was redhibitory. We find that he has failed to do so.

First, we note that Testa testified that he and other people have used the boat dock for its intended use when the following exchange took place:

Q      So who all has used the dock, just you personally or have other people gone out there and walked on it and gotten in and out of your boat?
A      No.

Q      So is it just you?
A      Just me - - well, I've got an older son who has probably - - he's been on it.

Q      So it's not just you, other people have used it too then?
A      Yes.

As such, any argument by Testa that the boat dock is completely useless is without merit. This testimony clearly indicates that Testa has used the boat dock for its intended use. However, given the possibility of a finding that multiple defects, while minor, can constitute a product that is redhibitory, we will address Testa's complaints about each part of the boat dock separately.

The three parts of the boat dock are the permanent deck, the gangplank, and the floating dock. Testa's complaints about the permanent deck were that it was less than the requested dimensions of forty-eight inches wide by forty-eight inches long, that he had to walk through some water to get to the permanent deck from his residence due to the location of the permanent deck, and that it sagged on one of the four corners.

Both Kays testified that when a construction contract is consummated with a request for a forty-eight inch by forty-eight inch measurement, it was within standard construction practices for those measurements to be slightly more or less than forty-

4

eight inches in order for the construction to be pleasing aesthetically. Clay Kays testified as follows:

> Q Is it within standard construction practices if it's contracted for forty-eight inch that it may have a little bit of variance with it when you have to trim off the edges of the boards?
>
> A Correct. Yes, it is.
>
> Q And is that standard practice in the industry based on your experience in this?
>
> A Yes, sir.

Clay Kays' testimony in this regard is corroborated by the testimony of Keith Kays. Keith Kays testified to the following:

> Q If you've got a four foot by four foot deck, is there - - I mean, when you've building out there and it's not having to fit in between two other things, its just out in the open like this was, is there a natural variance that may be a half an inch bigger or half an inch smaller?
>
> A There's a variance on the codes given to those measurements. You're allowed variances because you're dealing with wood. You don't have any say so over the product that you're being given. And you cut a board - - you cut a eight foot board in half, your blade width is an eight already then you set them in there on a string line but the cuts, even the factory cuts, have to be shaped up. That's taking a little bit more. When you run your string line and pop it - - what we do is pop a chalk line and then we take a saw and we come down the side of the deck to just shape it up for visibility purposes. We don't then re-measure and start replacing boards if they're a half inch out or a quarter inch out. Half inch means there's a quarter inch on each side of difference. . . .
> . . . .
>
> Q Has it been like that on every deck you've built?
>
> A Every deck I've built.

The testimony above gave the trial court a basis to find that completed measurements, whether slightly more or less than the contracted measurements, were standard for this particular industry, in this particular location, and, thus, not a defect.

With regards to the location of the permanent deck, both Kays testified that the location of the permanent deck was chosen by Testa due to his desire to keep a

5

cypress tree from having to be removed from his land. Clay Kays' testimony on this issue follows:

> Q   And who chose where [the permanent deck] was to be built, did you decide or did Mr. Testa tell y'all where to build it?
>
> A   [Mr. Testa] was out there whenever we started. We looked at it and he said he wanted it here between the trees without taking the tree out if possible.

Keith Kays' testimony again corroborated Clay Kays' testimony when the following exchange took place:

> Q   And you placed the [permanent] decking there because that's where Mr. Testa told y'all to put it, correct?
>
> A   That's correct.

Given this testimony, it is clear that the trial court was not unreasonable in finding that Testa's complaints regarding the location of the deck were unwarranted. It was certainly logical for the trial court to find that Testa cannot claim a defective location of the deck when he knew of the location and, in fact, played an integral part in creating the alleged defect.

Finally, with respect to the one corner of the permanent deck sagging three inches, Keith Kays testified that having to level the deck was not unexpected due to settling of the ground. Further, Keith Kays testified that the costs to level the permanent deck were minimal, "[t]wo hours work, two guys. You're talking about fifty bucks. Off of me, not off the client. I would have gone in and done it for free."

While the sagging corner of the permanent deck could be considered a defect, that defect is minor, and the evidence suggests that it could be remedied for a minimal cost. Such an easily fixable and minor defect does not make the deck's use "so inconvenient that is must be presumed that a buyer would not have bought the thing," nor does it rise to a level where "it diminishes its usefulness or its value so that it

6

must be presumed that a buyer would still have bought it but for a lesser price."

La.Civ.Code art. 2520. Thus, the trial court's determination that Testa failed to prove

that the permanent deck was redhibitory was a reasonable one.

Next, Testa's complaints regarding the gangplank were, like the permanent

deck, that it was not the exact measurements that were agreed upon, that it bowed in

the middle, and that its angle going from the permanent deck to the floating deck was

too steep. Again the testimony of Keith and Clay Kays provided a basis for the trial

court to give no credence to Testa's complaints.

As we addressed with respect to the length and width of the permanent deck,

again both Kays testified that the width and length of the gangplank, while slightly

less than forty-eight inches and shorter than twenty feet, was within the industry

standards expected in construction of a gangplank. In dealing with the bowing of the

gangplank, Keith Kays testified as follows:

> Q  And you heard the gentleman dealing with construction earlier
> talking about saying that [the gangplank] sagged too much. He
> had pictures showing that it was bowed a little bit. Is a twenty
> foot gangplank going to have some give to it?
> A  Absolutely
>
> Q  Especially when people walk on it?
> A  Absolutely
>
> Q  Is that within the standards of construction in your industry?
> A  At these costs they are.
>
> Q  Is there a way, if Mr. Testa wanted to spend more money, that it
> could have been constructed where it didn't have as much say
> give or sway in it?
> A  Certainly.
>
> Q  But it was built to this standard so - - is it functional like this?
> A  Totally.
>
> Q  Is it safe?
> A  My weight is out there on it now [in the picture presented to the

witness], you take your guess.

Q      Is it safe the way it is constructed?
A      It didn't break under me.

Q      Is that a yes it's safe?
A      Yes.

This testimony provides a basis for the trial court to find that the bowing in the gangplank was not a defect. Finally, regarding the steepness of the gangplank, Keith Kays, Clay Kays, and even Testa testified that the steepness of the gangplank is directly proportional to the difference between the height where the permanent deck was located and the water level. We have found it reasonable for the trial court to find that Testa chose the location of the permanent deck. All parties have agreed that the water level of Toledo Bend Lake is chosen by the Sabine River Authority. The only remaining variable that affects the steepness of the gangplank is its length. Thus, the only remaining potential defect that could cause the gangplank to be too steep would be that of the gangplank's length. Keith Kays testified to the following in this regard:

Q      Is a twenty foot gangplank standard in all your construction on all these piers and boat docks on Toledo Bend?
A      It is.

Q      Obviously, when the lake is low, it's going to be steep. A fair statement?
A      Fair statement.

Q      When the lake is at 172 or close to that, it's going to be fairly level?
A      Something has to change, yes, sir.

Q      Fair statement?
A      Fair statement.

Q      Would you say the twenty foot gangplank is an average length to the ones that you've built - - all these that you've build on Toledo Bend?
A      Above average.

This testimony provides a basis for the trial court to find that the gangplank was not defectively too short. Further, both Kays testified that the gangplank was functional and that, while they could make a longer gangplank, to do so would require that the cost of the project would exceed the limit placed on the project by Testa, and that Testa was aware of this extra cost when he agreed to the ganplank's length. Accordingly, we find it reasonable for the trial court to find no defect in the gangplank in its width, bowing or steepness.

Finally, Testa complained about the floating boat dock in that it did not float level, and that it was shoddily constructed. Both Kays testified that the reason the floating boat dock was not level was due to the cost constraints placed on its construction by Testa. Clay Kays testimony on this issue follows:

Q    And what did Mr. Testa say when you told him that you recommended those two twelves and sixteen inch floats?

A    All I want to pay is five thousand dollars, you know, all - - that's it. Can we get away with the, you know, get away with the floats of some sort. I said yeah, we can get away with them. They will float the structure.

Q    Did y'all then decide, with your conversation with Mr. Testa and he agreed, that there would be something other than the two twelves and the sixteen inch float?

A    It'd be three twelve inch floats.

Q    And that's what Mr. Testa had agreed to do at that time?

A    And that's what we built.

Q    And did y'all recommend to him at that time, again because this is important, that he have a sixteen inch float at that intersection?

A    My father had lengthy discussion with him about that.

Q    And was it Mr. Testa's decision not to have the sixteen inch float but to go with the twelve inch float?

A    His attitude was aw, we can get away with it. I said okay.

Q    And was that based on your being there and a party to that conversation, you believe Mr. Testa made that determination based on finances?

9

A Yes.

. . . .

Q Clay, I want you to look at - - is this the actual structure - - not counting the poles in the water, is this the structure that y'all constructed?

A (witness looking at photo) Yes, sir.

Q Does it appear that in the middle at the intersection of the three prongs that it is down a few inches?

A Absolutely.

Q And is that exactly what you had warned Mr. Testa about by putting the sixteen inch float in?

A Exactly

Q Had the sixteen inch float been installed, as your recommendation, would it have had that sagging problem in the middle?

A No.

This testimony allows the trial court to have a reasonable belief that Testa was warned regarding this alleged defect and chose to go a route that risked this issue arising. As such, like the placement of the permanent deck, the trial court can reasonably conclude that Testa cannot now claim he had no knowledge of the defect.

Testa also complains of the shoddy construction of the floating dock. One specific complaint is that Testa contends that Kays used ungalvanized bolts in the floating dock's construction. In brief, Testa claims that the testimony of Mr. Nathan Firesheets was uncontradicted in regards to Kays' using ungalvanized bolts in the floating dock. This is not accurate. Mr. Firesheet's testimony regarding the use of ungalvanized bolts was that, in his opinion, the bolts used did not "look" galvanized. Further, this testimony is directly contradicted by the testimony of Keith Kays wherein he stated the following:

Q You heard the gentleman earlier testify that and it appears that on this one you've got a bolt that appears to have some corrosion on there. Did y'all use galvanized bolts in the construction of all this?

A    We did.

Q    Is there still some rust that will appear on galvanized?
A    On the outsides of them. The interlocking of the bolt is still intact.

Q    You've been doing this for seven years?
A    Yeah.

Q    That was your testimony?
A    Yeah.

Q    Have you ever had one of your bolts fail?
A    Not yet.

Q    Never had a problem?
A    No.

Q    Do you use galvanized bolts on everyone of them?
A    Totally.

The use of ungalvanized bolts was clearly controverted in testimony and, as such, it was reasonable for the trial court to find that they were, in fact, used. The other defects that Testa claims show shoddy construction were testified to by Mr. Firesheets. Mr. Firesheets was admitted by the trial court as an expert in general construction. When discussing Mr. Firesheets' qualifications, he admitted that he had constructed only two such boat docks, with only one of those two docks located on Toledo Bend Lake. Given Mr. Firesheets' lack of experience in constructing boat docks coupled with the seven years experience of Kays in constructing an estimated hundreds of such boat docks, it was certainly within reason for the trial court to disregard Mr. Firesheets' testimony in regards to shoddy construction in favor of the testimony of Keith Kays.

In summation, we find that the trial court was not manifestly erroneous or clearly wrong in finding that Testa did not carry his burden of proving that the boat dock was redhibitory. There exists a reasonable basis in the record to find that every

defect alleged by Testa was not, in fact, a defect. The only exception to this is the leaning of the permanent deck of three inches. With this alleged defect, we found it reasonable for the trial court to find that it did not rise to the level of a redhibitory defect as there is evidence in the record that it is a minor defect, easily correctable for a small financial expenditure, and did not preclude Testa from using the boat dock for its intended use. Accordingly, we find that assignments of error #1 and #2 are completely without merit and affirm the trial court's judgment in this regard.

**ASSIGNMENT OF ERROR #3:**

In this assignment of error, Testa contends that the trial court erred when it failed to award him reasonable expert fees, attorney's fees, and nonpecuniary damages in this matter. In order to recover these fees and damages, Testa must first prove that he is entitled to relief in his underlying redhibition claim. He has not done so. Therefore, this assignment of error, like assignments of error #1 and #2, are without merit.

**CONCLUSION:**

Testa raised three assignments of error. After conducting a manifest error review, we find that the trial court was not clearly wrong in its judgment. Accordingly, we affirm the trial court's judgment in favor of Kays that dismisses Testa's suit, and assess all costs of this proceeding to Testa.

**AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.